UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JAMES IRONS,

                    Plaintiff,

        – against –

LOUIS SCARCELLA, STEPHEN CHMIL,
MICHAEL PAUL, THE CITY OF NEW YORK,
and JOHN AND JANE DOES 1-25,

                    Defendants.

Case No. 23-CV-7633

**COMPLAINT**

JURY TRIAL DEMANDED

**SHANIES LAW OFFICE LLC**

David B. Shanies
Deborah I. Francois
110 West 40th Street, Tenth Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com

*Attorneys for Plaintiff James Irons*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

NATURE OF THE ACTION .............................................................................................. 3

JURISDICTION AND VENUE ......................................................................................... 4

CONDITIONS PRECEDENT ............................................................................................. 5

PARTIES .............................................................................................................................. 5

JURY DEMAND ................................................................................................................ 8

FACTS ................................................................................................................................. 8

    A.  The Crime and James Irons's Innocence ......................................................... 8

    B.  The Investigation and Initial Suspects .......................................................... 10

    C.  The Suppression of Exculpatory Information About Third-Party Suspect
       Ricardo James ................................................................................................ 11

    D.  The Coerced False Confession ....................................................................... 13

    E.  Widespread Media Attention on the Case and James Irons's Arrest ............... 18

    F.  The Trial and Wrongful Conviction ............................................................... 18

    G.  The Joint Reinvestigation ............................................................................... 21

    H.  The Joint Motion to Vacate and Trial Court's Decision .................................. 24

    I.  The City of New York's Deliberate Indifference to Police and Prosecutorial
      Misconduct, and Its Failure to Train, Supervise, and Discipline Its Employees ............ 24

        1.  Investigative Reports on Institutional Deficiencies Within the New York City
           Police Department and the Kings County District Attorney's Office ........................ 25

        2.  Demonstrated History of Police Misconduct by Defendants Louis Scarcella and
           Stephen Chmil ................................................................................................... 29

        3.  Other Case Studies in Improper Police Conduct ......................................... 34

        4.  Former District Attorney Charles Hynes's Deliberate Indifference to the
           Prosecutorial and Investigative Misconduct Occurring in His Office ...................... 38

        5.  The Ample Notice to Former District Attorney Charles Hynes of the
           Prosecutorial and Investigative Misconduct Occurring in His Office ...................... 42

6.   Examples of the Kings County District Attorney's Office's Unlawful Policies, Practices, and Customs ................................................................ 43

DAMAGES ............................................................................................................... 47

CAUSES OF ACTION .............................................................................................. 49

FIRST CAUSE OF ACTION
42 U.S.C. § 1983: Denial of Due Process and Right to a Fair Trial,
Fabrication of Evidence, and Suppression of *Brady* Information.......................... 49

SECOND CAUSE OF ACTION
42 U.S.C. § 1983: Malicious Prosecution and Denial of Fourth Amendment Rights ........... 52

THIRD CAUSE OF ACTION
42 U.S.C. § 1983: *Monell* Claim........................................................................ 53

FOURTH CAUSE OF ACTION
New York State Law: Malicious Prosecution ...................................................... 57

FIFTH CAUSE OF ACTION
New York State Constitution: Denial of Due Process and Right to a Fair Trial,
Fabrication of Evidence, Suppression of Exculpatory Information, and
Malicious Prosecution........................................................................................ 59

SIXTH CAUSE OF ACTION
New York State Law: Negligence ....................................................................... 59

REQUEST FOR RELIEF ............................................................................................ 60

Plaintiff James Irons, by his undersigned counsel, the Shanies Law Office LLC, as and for his complaint against the above-named Defendants, alleges as follows:

**INTRODUCTION**

1.      Mr. Irons brings this action under 42 U.S.C. § 1983 and New York State law, seeking to recover damages caused by the denial of his constitutional and legal rights and his resulting wrongful conviction and loss of liberty.

2.      In December 1995, the New York City Police Department (the "NYPD") arrested Mr. Irons for the murder of Harry Kaufman—a crime of which Mr. Irons was innocent.  A judgment of conviction was entered against Mr. Irons in October 1996 after he was wrongfully convicted of one count each of murder in the second degree and attempted robbery in the first degree.  Mr. Irons was sentenced to concurrent prison terms of 25 years to life on the murder count and of seven and one-half to fifteen years on the attempted robbery count.  He began serving the sentence immediately.  He spent approximately 27 years in prison for a crime he did not commit.

3.      Mr. Irons had no involvement in the attempted robbery or murder of Kaufman.  At the time of the crime, Mr. Irons was at home with his mother and was one of the individuals who called 911 to report the incident and summon help for the victim.

4.      Mr. Irons was exonerated last year after the Kings County District Attorney's Office's (the "KCDA") Conviction Review Unit (the "CRU") reinvestigated the case and determined that Mr. Irons was wrongfully convicted.

5.      As the reinvestigation showed, Mr. Irons's wrongful conviction was the product of government misconduct, including, *inter alia*, the coercion of a false confession from Mr. Irons by former NYPD detectives Louis Scarcella and Stephen Chmil—both of whom have since been implicated in a series of highly publicized, similar wrongful convictions—and the suppression of

1

favorable evidence, including that a prosecution witness had previously confessed to a police informant his own guilt of the crime.

6.      On July 15, 2022, nearly 26 years after he had been wrongfully convicted, Mr. Irons, his co-defendants Vincent Ellerbe and Thomas Malik, and Kings County District Attorney Eric Gonzalez filed a joint motion, under Section 440.10(1)(g) of the New York Criminal Procedure Law ("CPL"), to vacate the judgments of conviction on the grounds of newly discovered evidence (the "Joint 440 Motion" or "Motion").

7.      As District Attorney Gonzalez acknowledged, new evidence concerning Scarcella and Chmil's misconduct "would likely have undermined the reliability of [Mr. Irons's] confession," and "even without the new evidence [Mr. Irons's] confession was unreliable."

8.      Indeed, Dr. Saul Kassin, a preeminent expert on false confessions who was retained by the CRU, reviewed Mr. Irons's case and found it to be deeply troubling and "comparable to some of the worst wrongful convictions I have seen."

9.      District Attorney Gonzalez further acknowledged that Mr. Irons's alibi was credible and well supported and that even despite preclusion of important alibi evidence, "the [p]rosecution [d]id [n]ot [d]isprove" the alibi.

10.     As the CRU found, "there is no reliable credible evidence of guilt."

11.     Absent the Defendants' fabrication of evidence and suppression of exculpatory information, Mr. Irons never would have been convicted.

12.     At a July 15, 2022 hearing on the Joint 440 Motion, the Supreme Court of the State of New York, Kings County (the "Trial Court") granted the Motion and dismissed the indictment against Mr. Irons.

13.     The following factors, among others, caused Mr. Irons's wrongful conviction: the misconduct of individual Defendants Louis Scarcella, Stephen Chmil, Michael Paul, and John and Jane Does 1-25 (together, "Individual Defendants"); the unlawful failure by Defendant the City of New York (the "City") to prevent its agents' unlawful conduct, including by failing to train, supervise, and discipline its employees; and the City's unlawful policies, customs, and practices that caused violations of the constitutional rights of criminal suspects and defendants, including Mr. Irons.  Mr. Irons seeks redress for the official misconduct that caused him to spend nearly 27 years in prison, and the mental and physical injuries he sustained while incarcerated, as a result of his false and unlawfully procured conviction.

## NATURE OF THE ACTION

14.     This is an action to recover compensatory and punitive damages and an award of costs and attorneys' fees for violations of Mr. Irons's rights secured by 42 U.S.C. §§ 1983 and 1988 and the U.S. Constitution, including its Fourth, Fifth, and Fourteenth Amendments, and under New York State law, due to Defendants' fabrication of evidence to arrest and convict Mr. Irons for crimes he did not commit and suppression of information that was material to the determination of Mr. Irons's innocence or guilt.  Specifically, Defendants Scarcella and Chmil coerced Mr. Irons into giving a false confession, and Defendant Paul participated in this coercion and/or knew and failed to intervene or was deliberately indifferent to the fact that Scarcella and Chmil coerced a false confession from Mr. Irons.  The coerced and false confession served as the sole basis for Mr. Irons's arrest, indictment, prosecution, conviction, and nearly 27 years of wrongful incarceration. Additionally, Individual Defendants violated Mr. Irons's constitutional rights to due process and a fair trial by withholding exculpatory and other favorable information that would have prevented the wrongful conviction.

15.     The lawsuit also seeks to hold the City liable for constitutional violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  The City, through the NYPD and KCDA, maintained unlawful policies, practices, and customs during Mr. Irons's investigation, arrest, and trial.  In executing those unlawful policies, practices, and customs, the City violated the constitutional rights of criminal suspects and defendants, including Mr. Irons.  In Mr. Irons's case, the unlawful policies, practices, and customs enabled Individual Defendants, as well as other members, servants, employees, and agents of the City, to violate Mr. Irons's constitutional rights.  The policy-making officials acting on behalf of the City were deliberately indifferent to the constitutional violations that those unlawful policies, practices, and customs caused.  The City is also liable under New York state law, under the doctrine of *respondeat superior*, for the tortious conduct of its agents and violations of the New York State Constitution.  As a result, all Defendants are jointly and severally liable for Mr. Irons's injuries.

## JURISDICTION AND VENUE

16.     This action is brought under 42 U.S.C. §§ 1983 and 1988 because Mr. Irons alleges that he was deprived under color of law of his rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution, including by the coercion of a false confession; the fabrication of evidence, including the false confession of Mr. Irons and the false statements and testimonies of Defendants Scarcella, Chmil, and Paul; Mr. Irons's arrest and prosecution in the absence of probable cause; the suppression of *Brady* information;[1] and the denial of Mr. Irons's rights to due process and a fair trial.

---

1.  All references in this complaint to *Brady* and/or exculpatory information refer to the government's obligation under the Due Process Clauses of the Fifth and Fourteenth Amendments to disclose favorable information to a criminal defendant, and corresponding protections under the New York State Constitution.  *See, e.g.*, *Youngblood v. West Virginia*, 547 U.S. 867, 869-70 (2006); *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *United States v. Agurs*, 427 U.S. 97, 103-07 (1976); *Giglio v. United States*, 405 U.S. 150, 155 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Wilde v. Wyoming*, 80 S. Ct. 900, 901 (1960); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 335 U.S. 28, 31 (1957); *Berger v. United States*, 295 U.S. 78, 88

17.     This Court has original subject matter jurisdiction over Mr. Irons's federal law claims under 28 U.S.C. §§ 1331 and 1343, this being an action seeking redress for the violation of Mr. Irons's constitutional and civil rights, and supplemental jurisdiction over Mr. Irons's state law claims under 28 U.S.C. § 1367.

18.     Venue is proper in the United States District Court for the Eastern District of New York under 28 U.S.C. § 1391 because Mr. Irons's claims arose in this District.

## CONDITIONS PRECEDENT

19.     Mr. Irons has complied with all conditions precedent to the commencement of this action, having timely served on August 25, 2022 a notice of claim upon the Comptroller of the City of New York, under Section 50-i of the New York General Municipal Law; having waited more than 30 days since said service, without these claims having been settled or otherwise resolved; having had a hearing on March 22, 2023, under Section 50-h of the New York General Municipal Law; and having brought this action in a timely manner.

## PARTIES

20.     Plaintiff James Irons is a citizen of the United States and was, prior to his incarceration, a resident of Kings County in the City and State of New York.

21.     Defendant the City of New York is and was at all relevant times a municipal corporation existing under and by virtue of the laws of the City and State of New York, and having the powers and duties imposed by law thereon.

22.     The NYPD and KCDA are and were at all relevant times agencies of Defendant the City of New York.  At all times relevant to this action, Defendant the City of New York, by its

---

(1935); *Poventud v. City of New York*, 750 F.3d 121, 133-36 (2d Cir. 2014); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 137 (2d Cir. 1964); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 570-71 (2d Cir. 1961); *United States v. Zborowski*, 271 F.2d 661, 668 (2d Cir. 1959).

agents, servants, and employees, was responsible for the operation, maintenance, and control of

the NYPD and KCDA, and for the selection, training, supervision, and discipline of police officers

and prosecutors.

23.     At all relevant times, the Kings County District Attorney (the "District Attorney"

or "DA"), including Charles Hynes, was and is an elected officer of Kings County responsible for

the KCDA, an agency funded by Defendant the City of New York.

24.     At all relevant times, the KCDA and its authorized delegates had final authority,

and constituted policymakers for the City of New York and for whom the City of New York is

liable, with respect to the hiring, management, training, supervision, and discipline of personnel

employed by or assigned to the KCDA.

25.     The State of New York has provided by statute that Defendant the City of New

York's constituent counties—including Kings County—and hence Defendant the City of New

York itself, are liable for torts committed by County officers and employees, such as the District

Attorney and Kings County Assistant District Attorneys, and other employees of the KCDA.  *See*

N.Y. County Law § 53,941.

26.     Defendant the City of New York was at all relevant times the public employer of

Defendants Scarcella, Chmil, Bond, and John and Jane Does 1-25, and legally responsible for torts

they committed within the scope of their employment or under color of law.  Defendant the City

of New York is also obligated under law and by contract to indemnify and defend Individual

Defendants named herein.

27.     Defendant Louis Scarcella is a former officer of the NYPD.  At all relevant times,

he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New

York, holding the rank of Second Grade Detective from March 25, 1988 until December 23, 1993,

and the rank of First Grade thereafter, until his retirement on March 25, 1999. At all relevant times, Defendant Scarcella acted toward Mr. Irons under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Scarcella liable in his individual capacity.

28.     In light of Defendant Scarcella's well-documented abuses, in or around 2013, the KCDA ordered the review of more than 50 cases, including Mr. Irons's, in which Scarcella played an important role. By 2016, that number had grown to 72. To date, nearly 20 convictions have been overturned in those cases. Moreover, in addition to Mr. Irons's conviction, at least eight other convictions—those of David Ranta, Shabaka Shakur, Vanessa Gathers, Jabbar Washington, Sundhe Moses, Eliseo DeLeon, and Mr. Irons's co-defendants Messrs. Ellerbe and Malik—have been vacated because Defendant Scarcella coerced false confessions or fabricated written confessions from innocent individuals.

29.     Defendant Stephen Chmil is a retired officer of the NYPD who served as Defendant Scarcella's longtime partner, including during the investigation and prosecution of Mr. Irons. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New York, holding the rank of Detective. At all relevant times, Defendant Chmil acted toward Mr. Irons under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York. This lawsuit seeks to hold Defendant Chmil liable in his individual capacity.

30.     Defendant Michael Paul is a retired officer of the NYPD. At all relevant times, he was a duly appointed and acting officer of the NYPD employed by Defendant the City of New

York, holding the rank of Detective.  At all relevant times, Defendant Paul acted toward Mr. Irons under color of law, and in his individual capacity within the scope of his employment under the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and City of New York.  This lawsuit seeks to hold Defendant Paul liable in his individual capacity.

31.     Defendants John and Jane Does 1-25 are employees of the NYPD or KCDA who acted toward Mr. Irons under color of law and within the scope of their employment under the statutes, ordinances, regulations, policies, customs, and practices of the State of New York and City of New York; and who participated in the misconduct alleged herein; but whose actual names Mr. Irons has been unable to ascertain notwithstanding reasonable efforts to do so.  This lawsuit seeks to hold Defendants John and Jane Does 1-25 liable in their individual capacities.

## JURY DEMAND

32.     Mr. Irons hereby demands trial by jury of all issues raised in this complaint.

## FACTS

**A.     The Crime and James Irons's Innocence**

33.     On November 26, 1995, at approximately 1:40 a.m., two men approached the token booth inside the subway station at Kingston Avenue and Fulton Street in Bedford-Stuyvesant, Brooklyn.

34.     The men attempted to rob Harry Kaufman, the clerk who was in the booth.  When Kaufman refused to hand over money, one of the men poured gasoline from a plastic bottle into the coin slot.  He or his accomplice then lit a book of matches, igniting the gasoline and causing the booth to explode and catch on fire.

35.     Kaufman was blown out of the booth.  He ran upstairs to the street, emerging from the station engulfed in flames.  Passersby helped to extinguish the fire on his clothing.

36.     Nineteen calls, starting at 1:40:33 a.m., were made to 911 regarding the incident. The callers reported variously that there was an explosion in or near the subway station and that a man was on fire.

37.     One of those callers was Darlene Williams, who reported that a man on fire just emerged from the subway station.  She recounted that the perpetrators were "two white boys that ran," and then that they were "two light skins . . .  he could look like [a] white boy."

38.     Also among those 911 calls was one from Mr. Irons, who lived around the corner from the crime scene and was at home at 1486 Fulton Street with his mother, Miriam Graham, at the time of the murder.  Far from having any involvement with the crime, Mr. Irons was one of the people who tried to summon help for the victim.

39.     After hearing the explosion, Mrs. Graham told Mr. Irons to call 911.  Mr. Irons called 911 at 1:41:54 a.m., reporting that "somebody on fire" on Fulton and Kingston.  Shortly thereafter, he passed the phone to his mother, telling the operator, "Hold on, my mother wants—."

40.     During the call, Mr. Irons's breathing was normal and unlabored.

41.     Mrs. Graham took the phone from Mr. Irons at 1:43:32 a.m. and provided further information to the operator.  She reported, "[T]he token booth on Kingston Albany just blew up. Man came out running out, he's on fire. . . .  [T]here's a whole lot of people standing right out there."  She provided her name and phone number and was told that assistance was on its way. The call ended at 1:44:22 a.m.

42.     Members of the NYPD and the New York City Fire Department arrived at the crime scene shortly after the 911 calls and transported Kaufman to a hospital.

43.     Kaufman suffered severe burns and died of his injuries on December 10, 1995.

**B.**     **The Investigation and Initial Suspects**

44.     Defendants Scarcella and Chmil were the lead homicide detectives assigned to the case.

45.     The evidence recovered from the scene included a rifle, a plastic bottle containing gasoline residue, a book of matches that appeared to have been lit simultaneously, and a burnt glove.

46.     The police had several tips early in its investigation, as well as a number of initial suspects.

47.     Those suspects included three men known as "Sport," "Crime," and "Biz."

48.     On November 26, 1995, at approximately 6:30 p.m., a female confidential informant reported to police a conversation she had, at about 2:00 a.m. that morning, that Crime and other men blew up the token booth, and that Crime wanted to hide at "Ringy's" drug spot.

49.     On November 27, 1995, the NYPD interviewed Miguel Ortiz, who said he saw Sport, Crime, and Biz with a gun at a party shortly before the murder and that the three men left the party with the gun shortly after 1:00 a.m.  Ortiz described the gun in detail and identified a photograph of the gun recovered from the crime scene as the same gun he saw at the party.

50.     Sport and Crime matched the victim's descriptions of the two men who approached and lit his booth on fire.

51.     The NYPD issued "wanted" cards for Sport, Crime, and Biz, all of whom had open arrest warrants at the time of the murder.

52.     Defendants Scarcella and Chmil interviewed Biz, who said that he and Sport were at the party attended by Ortiz but that he (Biz) left the party at 5:00 a.m.

53.     There is no evidence of Sport or Crime ever being interviewed by the police in connection with this crime.  Their wanted cards in this case were canceled on December 22, 1995 and January 11, 1996, respectively.

54.     In March 1996, one of the trial prosecutors wrote in their notes, "How did we ultimately eliminate crime, sport et. [a]l"?  The answer is that they never did.

55.     Another early suspect was "Ringy," whose name first came up on the day of the crime, as noted above, and whom police knew had an open arrest warrant.

56.     Ringy's name came up again on December 12, 1995, when an anonymous female reported that "Ringy" and "Kato" were responsible for the arson, and that "Antwan" drove the getaway car.  That same day, an anonymous male caller reported that Ringy was at his sister's apartment.  When the police executed a search warrant, however, Ringy was not there.

57.     The police issued a wanted card for Ringy and created a photo array including his photo.

58.     On January 18, 1996, Defendants Scarcella and Chmil interviewed Ringy, who denied involvement with the crime.

**C.     The Suppression of Exculpatory Information About Third-Party Suspect Ricardo James**

59.     Yet another early suspect—and one who would later testify against Mr. Irons as a prosecution witness—was Ricardo James, who confessed to a police informant that he committed the crime with "Tyrone Jefferson" and the "Zoe brothers," "Pop" and "Pepe."

60.     Defendant Chmil interviewed the informant on December 13, 1995.

61.     Detectives brought Ricardo to the precinct on December 13th.

62.     The detectives also took to the precinct Mr. Irons, whom they had seen in the neighborhood while looking for Ricardo.

63.     Defendants Scarcella and Chmil interviewed Ricardo at the precinct.

64.     Ricardo admitted to the police that he was present at the crime scene.

65.     Defendants Scarcella and Chmil's interview of Ricardo was interrupted when the detectives were pulled away to interrogate Mr. Irons.

66.     On December 14, 1995, the police again interviewed the confidential informant to whom Ricardo had confessed.  During the interview, the informant reported that both Ricardo and Jefferson admitted to committing the crime, and that she (the informant) knew Ricardo from high school.  She recounted that Ricardo told her that he, Jefferson, and the Zoe brothers planned to "hold up the booth with a gun" but "couldn't because of the glass, so went to 'Plan B'" and sprayed gas into the booth, at which point "the man's" clothes caught on fire.  She further stated that the Zoe brothers were 22 to 23 years old.

67.     Later that evening, detectives conducted an identification procedure at the precinct. The confidential informant identified Ricardo as the person who had confessed to her.

68.     All the information concerning Ricardo and his confession was patently exculpatory and in the hands of law enforcement early in its investigation, yet none of it was disclosed to the defense at trial—even when the prosecution called Ricardo as a witness.

69.     The defense was not informed, for example, of Ricardo's confession, the existence or identity of the witness to the confession, the fact that the witness positively identified Ricardo as the perpetrator, or the fact that Defendants Scarcella and Chmil had been advised of the informant's naming of other alleged perpetrators.

70.     Nor was the defense provided with Detective Chmil's notes summarizing the informant's account of Ricardo's confession; Detective Mario Delucia's notes memorializing his interview of the informant, who again recounted that Ricardo admitted to committing the crime;

12

or the results of the identification procedure during which the informant positively identified Ricardo.

71.     Notwithstanding the early and detailed information provided by the confidential informant and her positive identification of Ricardo, the police released Ricardo once Defendants Scarcella and Chmil coerced Mr. Irons into giving a false confession, described in greater detail below, in which he implicated Messrs. Ellerbe and Malik, two men Mr. Irons barely knew.

**D.     The Coerced False Confession**

72.     While Ricardo was being interviewed, Defendant Paul saw Mr. Irons in the waiting area of the precinct.  Despite being minimally involved in the investigation up to that point, Paul took it upon himself to approach and question Mr. Irons about the incident.

73.     In response to Defendant Paul's questions, Mr. Irons told the officer that he heard an explosion from his apartment window a few buildings away and on the opposite side of the street.

74.     Defendant Paul accused Mr. Irons of lying, even though at the time of the questioning, Paul neither had investigated the area of the crime scene nor was familiar with Mr. Irons's building, and therefore had no reason to doubt Mr. Irons's account.  Though Mr. Irons's account was true, Defendant Paul insisted that what Mr. Irons described was impossible.

75.     During the interrogation, Defendant Paul observed indications of Mr. Irons's significant intellectual disabilities.

76.     Defendant Paul failed to memorialize his conversation or interaction with Mr. Irons.

77.     After confronting Mr. Irons, Defendant Paul delivered Mr. Irons for interrogation to Defendants Scarcella and Chmil.

78.     Defendants Scarcella and Chmil, cutting short their interview of Ricardo, turned their attention to Mr. Irons and began interrogating him at 1:30 a.m. on December 14, 1995.

79.     Mr. Irons had significant cognitive deficits that were apparent to the detectives and marked Mr. Irons as someone from whom they could extract a false confession.

80.     Mr. Irons—an intellectually challenged, naïve, highly suggestible, poor, Black teenager, inexperienced with law enforcement—was a perfect victim for Scarcella and Chmil, two false confession specialists.

81.     Defendants Scarcella and Chmil did not inform Mr. Irons of his *Miranda* rights until an hour into the interrogation.

82.     When Mr. Irons signed the *Miranda* waiver, he printed his name rather than using cursive script, and misspelled his name as "Irens" before superimposing an "o" over the "e."

83.     During the interrogation, Defendants Scarcella and Chmil fed key details to Mr. Irons, including by showing him a photograph of the rifle found at the crime scene and describing and/or showing him a photograph of the gasoline container.

84.     Defendants Scarcella and Chmil also fed false facts to Mr. Irons, including that a person he supposedly knew as "Ringy" was involved with the crime and had shot Mr. Irons in the leg the previous year.[2]

85.     This story concerning Ringy was entirely false, and the fact that Mr. Irons has never been shot in the leg—by Ringy or by anyone else—is undisputed.

86.     Notably, Ricardo, whom the detectives had interviewed immediately before Mr. Irons, *had* previously been shot in the leg by Ringy.

87.     Moreover, the first mention of Ringy during Mr. Irons's interview was when Defendant Paul interrupted the interrogation to ask Mr. Irons whether he knew anyone with that name.

---

2.   In the trial transcript, Ringy's name is spelled as "Ringie."

88.     During the interrogation, Defendants Scarcella and Chmil repeatedly accused Mr. Irons of lying when Mr. Irons insisted that he was home with his mother at the time of the incident.

89.     Defendant Scarcella and other detectives whose identities are presently unconfirmed also physically assaulted Mr. Irons and threatened him with a gun.

90.     One or more detectives repeatedly struck Mr. Irons in the head when he did not deliver answers as they had instructed.

91.     In addition, one of the detectives removed a loaded revolver from his ankle holster and brandished it, then dramatically removed the bullets from it and challenged Mr. Irons to take hold of the gun, which he refused to do.

92.     Detectives interrogated Mr. Irons for hours and hours, including overnight, depriving him of sleep.

93.     Defendants Scarcella and Chmil ultimately wrung a false confession from Mr. Irons and coerced him into signing a false, handwritten statement and a falsified DD5 police report, both of which Chmil prepared.  Defendant Paul participated in this coercion and/or knew or was deliberately indifferent to the fact that Scarcella and Chmil coerced a false confession from Mr. Irons.

94.     In both documents, Mr. Irons, who was illiterate, printed rather than signed his name.

95.     Mr. Irons neither could read what was written in the documents nor knew what was written in the documents when he signed them.

96.     He signed the documents because he was frightened of the detectives and would have signed anything they put in front of him.

97.     Following the hours-long interrogation late at night and into the morning by Defendants Scarcella and Chmil, Mr. Irons was then forced into giving a false videotaped statement, from 6:12 a.m. to 6:49 a.m., to Assistant District Attorney ("ADA") Lori Grifa.

98.     Prior to the interview with ADA Grifa, Defendants Scarcella and Chmil instructed Mr. Irons to repeat in the videotaped statement what was in the written statement. As they coached Mr. Irons on what to say, they repeatedly hit him on the head if he incorrectly recited to them the false details that they had fed him.

99.     Defendant Chmil was present for the videotaped interview with ADA Grifa.

100.    During the interview, rather than have Mr. Irons describe the alleged events in his own words, ADA Grifa primarily asked yes/no questions and provided the account herself, leaving Mr. Irons merely to agree or disagree.

101.    Many of her questions were leading and intended to induce responses consistent with the false handwritten statement that Mr. Irons had been coerced into giving earlier.

102.    When Mr. Irons could not recall certain details that Defendants Scarcella and Chmil had previously fed him, ADA Grifa "assisted" Mr. Irons by inappropriately giving him clues and coaxing him into the response she wanted.

103.    Even with such prompting, Mr. Irons was unable to relate even the most basic facts or repeat what the detectives had included in the written statement.

104.    As a result, the videotaped statement was different in numerous, material respects from the written statement; internally contradictory; constantly changing; and confused.

105.    Mr. Irons was inconsistent about and had difficulty explaining, *inter alia*: (1) details about his alleged accomplices, including the number of accomplices, their names, and when and where he met them; (2) the planning of the crime, including when the first meeting took place,

16

when the getaway car was first discussed, and when Mr. Ellerbe allegedly gave him a gun; (3) the roles that he and his alleged accomplices played during the commission of the crime; (4) the description of the plastic container of gasoline; (5) the words exchanged with the victim prior to squirting the gasoline and whether any money was demanded; and (6) the distribution of the gasoline and the lighting of the fire.

106.    For example, throughout the interview, Mr. Irons could not recall Thomas Malik's name, which, according to the written statement, Mr. Irons allegedly mentioned early and frequently when speaking with the detectives.

107.    During the video interview, however, Mr. Irons had to be repeatedly prodded for the name by ADA Grifa, who told Mr. Irons to take his time and suggested to him that "this [is] a name that you just can't remember now that we're talking."

108.    Mr. Irons came up with Mr. Malik's name only after a half dozen failed attempts, and only after ADA Grifa flat out asked, "Could that be Tommy," once Mr. Irons hesitatingly said the name started with a "T."

109.    Mr. Irons likewise struggled to remember Ringy.

110.    Mr. Irons claimed during the videotaped interview that "Ringo" joined in the subway station.  ADA Grifa, realizing that Ringo did not match the name "Ringy" provided in the written statement, but failing to remember the name herself, asked Mr. Irons if he knew Ringo by the nickname "Ricky."  Mr. Irons replied that he knew him only as Ringo.

111.    Mr. Irons then told ADA Grifa he knew Ringo from a party he attended around Thanksgiving.  When asked if he knew Ringo from anywhere else, Mr. Irons said he did not, despite having allegedly told Defendants Scarcella and Chmil just hours earlier that Ringy had shot him in the leg the year before.

### E.     Widespread Media Attention on the Case and James Irons's Arrest

112.    The case and Mr. Irons's arrest were highly publicized, in part because the media and various officials promptly linked the case to a movie called *Money Train*, which had been released four days earlier and depicted a similar arson in the New York City subway.

113.    Then-New York City Mayor Rudy Giuliani immediately dubbed the case the "Money Train" murder, claiming without factual basis that it was inspired by the film.

114.    The case gained national notoriety when then-Senate Majority Leader and Republican presidential hopeful Bob Dole took to the Senate floor to call for a boycott of the movie.

115.    Major media outlets, including *The New York Times*, the *Los Angeles Times*, and *The Washington Post*, also drew parallels between the crime and the film, describing the crime as a "botched robbery that replayed scenes from the movie 'Money Train'"; reporting that the movie "contains two scenes that are virtual replays of the crime"; and writing that "life imitated art imitating life."

116.    Comparisons between the crime and the movie persisted through the years.  Both were featured, for example, in a 2018 episode of the television series *CopyCat Killers*, which tells stories of real crimes purportedly copied from Hollywood movies.  This 2018 episode, titled "Money Train," claims the film "inspire[d] an identical copycat crime just four days after the movie premieres," and names Mr. Irons as "the third perpetrator."  To this day, online synopses of the episode continue to name Mr. Irons as one of the killers.

117.    Although there was never any evidence to suggest that the film played any role in the case, the early connection between the two made the case that much more infamous.

### F.     The Trial and Wrongful Conviction

118.    Mr. Irons's trial commenced on October 8, 1996.

119.    Mr. Irons presented testimony from Darlene Williams, one of the 911 callers who reported the incident.

120.    Consistent with her prior accounts, Ms. Williams testified at trial that the two individuals she saw exit the subway station were light-skinned males who almost looked white—physical descriptions entirely different from that of Mr. Irons.

121.    Counsel pointed to Mr. Irons in the courtroom and asked Ms. Williams if she recognized him "from anywhere."  She replied unequicovally, "No, I don't."

122.    Mr. Irons also presented testimony from his mother, Mrs. Graham, with whom he had been at home at the time of the murder.

123.    Mrs. Graham testified that after hearing an explosion and seeing from her window a man on fire, she instructed Mr. Irons to call 911.  She further testified that after Mr. Irons called 911, she took the phone from him because she could "explain it better."

124.    Counsel sought to admit Mr. Irons's 911 call into evidence during Mrs. Graham's testimony.  The prosecution repeatedly and vehemently objected.

125.    Finally, Mr. Irons testified in his defense, affirming that he was innocent and at home with his mother at the time of the murder.

126.    Mr. Irons testified that he did not know anything about the crime, that he was not at the scene or involved in any way, and that he knew Mr. Ellerbe but none of the other alleged accomplices whose names appear in the handwritten statement.

127.    Mr. Irons testified that he neither knew anyone named Ringy nor had ever been shot in the leg.

128.     Mr. Irons testified that he completed the tenth grade and had been enrolled in a Special Education program at school.  He further testified that he could not read and could write only "[a] little bit."

129.     Regarding the day of the incident, Mr. Irons testified that he called 911 per his mother's request and spoke with the person who answered.

130.     At that point, counsel said, "Your Honor, with the Court's permission, if I could ask the defendant to listen to the tape to identify his voice."  The prosecution asked, "[C]ould we step up," and an off-the-record, sidebar discussion ensued.

131.     Mr. Irons was then further questioned about his 911 call.  He testified, among other things, that his mother took the phone from him.

132.     Following Mr. Irons's testimony, a tape recording containing eighteen 911 calls, except for Mr. Irons's portion, was admitted into evidence.[3]

133.     Mr. Irons was precluded from presenting to the jury his portion of the 911 call, which would have dramatically undermined the prosecution's theory of the case.

134.     There is not and never was any physical or forensic evidence linking Mr. Irons to the murder.

135.     The only evidence presented against Mr. Irons at trial was the false confession that Defendants coerced from him.

136.     At summation, the prosecution falsely claimed that "[e]ach and every aspect of that confession is corroborated by independent evidence."  The prosecution also argued that the details Mr. Irons provided in his videotaped statement—details that did not appear in his written statement—were a basis for believeing Mr. Irons's false confession.

---

3.   As noted above, a nineteenth call was made to 911 regarding the incident.  For reasons unknown, this call was not admitted into evidence at trial.

137.    To the contrary, of the "details" provided in the videotaped statement that were not already known to Defendants Scarcella and Chmil, not a single one was ever independently corroborated.

138.    Moreover, exculpatory information pointing to third-party guilt—in particular, that of Ricardo James—was disregarded and withheld from the defense.

139.    Mr. Irons did not commit any of the acts alleged in the indictment against him.

140.    Nevertheless, at the conclusion of the trial, Mr. Irons was convicted of murder in the second degree and attempted robbery in the first degree.

141.    On November 18, 1996, the Trial Court sentenced Mr. Irons to concurrent prison terms of 25 years to life on the murder count, and seven and one-half to fifteen years on the attempted robbery count.

### G.      The Joint Reinvestigation

142.    The CRU began reinvestigating Mr. Irons's case in 2013, when the KCDA reopened and investigated dozens of cases linked to Defendants Scarcella and Chmil.

143.    At the time, longtime partners Defendants Scarcella and Chmil had been gaining infamy for having engaged in patterns of misconduct to secure convictions at the expense of justice and due process.

144.    Their abusive tactics included forcing false confessions from innocent suspects and concealing exculpatory information.

145.    Following the KCDA's nearly decade-long review of cases related to Defendants Scarcella and Chmil and its findings of misconduct by the detectives, nearly 20 convictions have been overturned.

146.    In a number of those cases, the false confessions included language remarkably similar to that allegedly used by Mr. Irons when he falsely confessed.

21

147.    Specifically, at trial, Defendant Chmil described Mr. Irons breaking down and telling him, "You have it right"—language that does not appear in the written statement or any other document.

148.    Numerous other false confessions taken by Defendant Scarcella and/or Defendant Chmil contain the same or similar language: "Yeah, you're right" (David Ranta); "You know what happened, you have it all" (Shabaka Shakur); "You got it right" (Jabbar Washington); "You guys got it right" (Hector Lopez).[4]

149.    Consistent with the extensive and mounting evidence of Defendants Scarcella's and Chmil's egregious misconduct, the conviction integrity reinvestigation concluded that Mr. Irons's confession—the only purported evidence of his guilt—was demonstrably false and bore numerous indicia of coercion by the detectives.

150.    Indeed, two renowned experts on false confessions separately and consistently pointed to major concerns that the confession by Mr. Irons, who was a teenager at the time of the murder and had extreme cognitive deficits, demonstrates indicia of falsity.

151.    Dr. Bruce Frumkin, a clinical psychologist, evaluated Mr. Irons and found that he: (1) has significant cognitive deficits; (2) is to an extreme degree more susceptible than others to police influence; and (3) is at much higher risk than others of falsely confessing because of his cognitive deficits and interrogative suggestibility.

152.    The CRU engaged its own expert, Dr. Saul Kassin, who is a leading expert in police interrogation tactics and false confessions.  Dr. Kassin concluded that: (1) there were numerous personal risk factors regarding the voluntariness of the confession, including that Mr. Irons was arrested and someone who was easily confused; (2) there were likewise numerous situational risk

---

4.    Stephanie Clifford, *Scarcella Again Defends His Methods on the Witness Stand*, N.Y. TIMES, Dec. 4, 2014, https://nyti.ms/3MYENDi.

factors, including that Mr. Irons was interrogated late at night and into the morning and was likely sleep deprived; (3) Mr. Irons's statements offered no proof of firsthand guilty knowledge; (4) none of his statements contained accurate crime facts that the detectives did not already know or led them to new evidence they did not already have; (5) there was substantial evidence of contamination; and (6) external corroboration of the confession was weak to nonexistent.

153.    Dr. Kassin found Mr. Irons's case to be deeply troubling and "comparable to some of the worst wrongful convictions I have seen."

154.    The reinvestigation also confirmed that it was likely physically impossible for Mr. Irons to have committed the crime.

155.    Mr. Irons lived across Kingston Avenue from the subway station, three buildings west of the corner, on the same side of Fulton Street.

156.    For Mr. Irons to have participated in the crime and reported the fire to 911, he would have had to: (1) recover from the physical impact caused by the explosion (an explosion that, according to the responding fire marshal, would have caused anyone standing near the booth to be "knocked on their ass"); (2) climb 31 stairs and pass a corridor between staircases in the underground subway station; (3) cross a street; (4) pass several buildings; (5) walk through two doors to enter the apartment building, both of which, according to the evidence, were most likely locked; (6) climb four flights of stairs; (7) walk through a door to enter the apartment, which, according to the trial file and reinvestigation, was also mostly likely locked; (8) connect with his mother and tell her the token booth blew up (as the prosecution argued at trial he did); (9) pick up the phone and dial 911; and (10) wait for the line to ring and the operator to pick up—all within the span of 77 to 110 seconds.

157.     As the reinvestigation showed, it was likely impossible for all this to happen during the limited timeframe—to say nothing of the unlikelihood that a severely intellectually handicapped teenager could have devised and executed a plan to fabricate an alibi within seconds of participating in a brutal murder.

**H.     The Joint Motion to Vacate and Trial Court's Decision**

158.     Following the reinvestigation, on July 15, 2022, Mr. Irons, his co-defendants Messrs. Ellerbe and Mr. Malik, and District Attorney Gonzalez filed the Joint 440 Motion to vacate the three men's judgments of conviction on the grounds of newly discovered evidence pursuant to CPL Section 440.10(1)(g).  In the Joint 440 Motion, the District Attorney also moved to dismiss the indictment against all three men pursuant to CPL Section 210.40.

159.     District Attorney Gonzalez observed that new evidence concerning Scarcella and Chmil's misconduct "would likely have undermined the reliability of [Mr. Irons's] confession," and that "even without the new evidence [Mr. Irons's] confession was unreliable."

160.     District Attorney Gonzalez further acknowledged that Mr. Irons's alibi was credible and well supported and that even despite preclusion of important alibi evidence, "the [p]rosecution [d]id [n]ot [d]isprove" the alibi.

161.     Indeed, as the CRU found, "there is no reliable credible evidence of guilt."

162.     The Trial Court granted the Joint 440 Motion at a hearing on the Motion.

163.     The Trial Court vacated Messrs. Irons's, Ellerbe's, and Malik's convictions; dismissed the indictment against them; and sealed the case with respect to all three men.

**I.     The City of New York's Deliberate Indifference to Police and Prosecutorial Misconduct, and Its Failure to Train, Supervise, and Discipline Its Employees**

164.     Mr. Irons's wrongful conviction and imprisonment were not a random miscarriage of justice in an otherwise functioning law enforcement regime.  Rather, during the relevant period,

policymakers for both the NYPD and the KCDA, acting on behalf of Defendant the City of New York, engaged in the following misconduct, which was reflected, and led to the wrongful conviction, in Mr. Irons's case: acted with deliberate indifference to the constitutional rights of individuals suspected of or charged with criminal activity; and implemented or tolerated plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning the constitutional duties of City officials—including, *inter alia*, to properly document and disclose exculpatory information, and not to fabricate evidence by coercing innocent individuals into making false confessions.

### 1. Investigative Reports on Institutional Deficiencies Within the New York City Police Department and the Kings County District Attorney's Office

165.    Reports from several independent bodies demonstrate that Defendant the City of New York, during the relevant period, was plagued by institutional deficiencies that allowed a wanton and reckless culture to develop within the NYPD and KCDA.  This culture allowed employees of the NYPD and KCDA to violate constitutional rights of the citizens of the City of New York without disciplinary risk or repercussions.

166.    On July 7, 1994—just a year and a half before Mr. Irons's arrest—the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department (the "Commission") issued a report (widely referred to as the "Mollen Report") that addressed corruption in the NYPD.[5]  The Mollen Report investigated the 1980s and 1990s through the date of the report's publishing.  Importantly, the Mollen Report described the state of corruption in the present tense and stated that the Commission's "findings raise significant concerns about . . . the potential for these problems to grow without sustained vigilance and oversight."  Mollen Report at 1.

---

5.   The Mollen Report is available at http://bit.ly/3qyKkKv.

167.    The Mollen Report further noted that "[p]olice perjury and falsification of official records is a serious problem facing the Department" that "taints arrests on the streets."  *Id.* at 36. The Mollen Report described police falsifications as "probably the most common form of police corruption facing the criminal justice system," *id.*, and observed "a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world.  Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justified, even if unlawful," *id.* at 41.

168.    The Commission noted that it was "not aware of a single instance in which a supervisor or commander has been sanctioned for permitting perjury or falsification on their watch," *id.*, and found that "[t]here is no evidence that anyone in the Department's chain of command had focused on eliminating this practice, including past Police Commissioners and Internal Affairs chiefs, who apparently turned a blind eye to unlawful practices that were purportedly committed to fight crime and increase arrest statistics," *id.* at 41-42.  Given this situation, the Mollen Report determined that "successful enforcement of command accountability requires a complete reinvention of the systems for enforcing it."  *Id.* at 79.

169.    The Mollen Report concluded that "[o]fficers and their immediate supervisors are not the only culprits in tolerating falsifications . . . .  [T]he Department's top commanders must share the blame."  *Id.* at 41.

170.    This Court has already found that the Mollen Report "provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity" and "characterizes this custom as persistent, widespread, and emanating 'from top commanders, including the police commissioner.'"  *Pipitone v. City of New York*, 57 F. Supp. 3d

173, 191 (E.D.N.Y. 2014).  Accordingly, this Court has found that "[t]he Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes[.]"  *Id.* at 191.

171.    The lack of discipline documented in the Mollen Report continues to this day, as demonstrated by a report released by The Independent Panel on the Disciplinary System of the New York City Police Department (the "Panel"), chaired by the Honorable Mary Jo White, the Honorable Robert L. Capers, and former United States District Court Judge for the Southern District of New York Barbara S. Jones.[6]  The Panel's report (the "Panel Report"), released in January 2019, made specific note of the endemic culture of false testimony in the NYPD, which was repeatedly "brought to the Panel's attention."  Panel Report at 38.

172.    The Panel noted that while "the Patrol Guide provisions . . . expressly forbid officers from lying in connection with their duties, numerous stakeholders have expressed concerns about lax enforcement and practices that enable bad actors to escape accountability and avoid the presumptive termination penalty."  *Id.* at 39.  The Panel "share[d] the concern that the Department does not do so and treats false statement cases too leniently," *id.* at 40, particularly as several stakeholders "told the Panel that the Department does not charge officers with making false statements at all when the facts would support such a charge," *id.*, and another "stakeholder told the Panel that certain historic practices may contribute to a culture in which false statements are condoned," *id.* at 41.

173.    Furthermore, in 2009, the New York State Bar Association's Task Force on Wrongful Convictions (the "Task Force") released an investigative report covering 53 cases (the

---

6.   The Panel Report is available at https://www.independentpanelreportnypd.net.

"NYSBA Report").[7]  The Task Force found that "government practices" contributed to more than 50% of the wrongful conviction cases studied.   NYSBA Report at 19.  These practices included: (a) the use of false evidence; (b) the failure of the prosecutor to disclose *Brady* material; and (c) "the early prosecutorial focus, especially by the police, on a particular individual as the person who committed the crime coupled with a refusal to investigate to determine if there is a basis to believe, based on available information, that someone else may have committed the crime."  *Id*. All three of these practices contributed to Mr. Irons's wrongful conviction, where: (a) Mr. Irons's conviction was based solely on his false confession procured by Defendants Scarcella and Chmil; (b) the prosecution withheld from the defense that Ricardo, one of the prosecution's witnesses, had previously confessed to the crime to a police informant; and (c) the police immediately identified Mr. Irons as a suspect after Defendant Paul, with no valid basis, questioned Mr. Irons in the waiting area of the precinct and refused to accept Mr. Irons's truthful and innocuous explanation of his whereabouts at the time of the crime, and the police thereafter eliminated, with no explanation, other early leads as suspects.

174.    The Task Force recommended that police and prosecutors be trained and supervised in the application of *Brady* and truthful evidence rules.  *Id*. at 37-38.  Indeed, the Task Force observed that "despite the clarity and longevity of the *Brady* rule, a sampling of recent published or otherwise available decisions show [that *Brady* violations] still occur[]."  *Id.* at 26 (collecting New York cases).  The Task Force therefore suggested that, to the extent not already in existence, prosecutor's offices should implement internal procedures for preventing *Brady* and truthful evidence rule violations, for evaluating whether a prosecutor has engaged in misconduct, and for

---

7.   As noted in the NYSBA Report, available at http://bit.ly/3OVlxtf, the cases spanned from 1964 to 2004, a forty-year period that includes Mr. Irons' arrest in 1995 and conviction in 1996.  Most of the cases were from New York City.  Many were from Brooklyn.  NYSBA Report at 186.

imposing sanctions for any such misconduct. *Id.* at 29.  The Task Force also noted the importance of the police in upholding *Brady* obligations, given that "[p]rosecutors' access to exculpatory evidence known to the police depends ultimately on the willingness of the police to record, preserve, and reveal such evidence." *Id.* at 37-38.

175.    As discussed below, despite the significance of the *Brady* rule, neither the NYPD nor the KCDA had appropriate training, supervisory, or disciplinary procedures in place in the time leading up to Mr. Irons's arrest, indictment, trial, or post-conviction litigation.

### 2. *Demonstrated History of Police Misconduct by Defendants Louis Scarcella and Stephen Chmil*

176.    These investigative reports revealed a laissez-faire NYPD regime and a stunning pattern of falsification.  These findings are illustrated by the conduct of Defendants Scarcella and Chmil.

177.    Scarcella openly bragged, in a 2007 episode of the *Dr. Phil* television show, that he did not "play by the rules" as a homicide detective.

178.    Through the years, Scarcella has admitted under oath to attaching dollar bills to his business card, which he said helped to get tips on crimes; habitually writing suspects' confessions in his own hand because he "found that it makes them very uncomfortable" to do so themselves; and lying to suspects that he had evidence he did not, in fact, have—all plainly dubious practices.

179.    In July 2019, in a Kings County Supreme Court hearing to overturn Eliseo DeLeon's murder conviction, Chmil testified that he and Scarcella "used some questionable tactics."

180.    After Scarcella and Chmil were caught on video in 1992 removing an informant from jail for an unauthorized outing to meet his girlfriend, go shopping, and dine in restaurants, Chmil admitted that he and Scarcella "shouldn't have done it" and that "[i]t was improper."

181.    In 2000, Neil Ross, a New York criminal court judge and former prosecutor, posted on an internet cigar-smokers forum about how Scarcella helped him secure the murder conviction of Robert Hill, in large part through an eyewitness identification by Teresa Gomez, a habitual drug user Judge Ross himself viewed as incredible.  Reminiscing about a cigar he received from the "legendary detective" Scarcella as they celebrated Hill's conviction in a bar, Judge Ross wrote in his post that Gomez was "a woman who was even then ravaged from head to toe by the scourge of crack cocaine."  He further wrote that "[i]t was near folly to even think that anyone would believe Gomez about anything, let alone the fact that she witnessed the same guy kill two different people."

182.    In 2014, at a hearing where the Kings County Supreme Court granted a joint motion by Mr. Hill and the KCDA to vacate Mr. Hill's conviction, a prosecutor from the CRU described Gomez as an "extremely problematic witness" and "a troubled young person, hopelessly addicted to drugs, criminal in her conduct for the most part, increasingly erratic in terms of her accounts."

183.    Notwithstanding clear signs of her extreme unreliability as a witness, Scarcella used Gomez as a witness in at least *six* separate murder cases.  In addition to Mr. Hill, at least two other men identified by Gomez—Mr. Hill's half-brothers Darryl Austin and Alvena Jennette—have had their convictions cleared after the CRU reinvestigated the Scarcella-related cases and determined that Gomez was not credible.

184.    Chmil likewise hinged his cases on unreliable witnesses who were heavily addicted to drugs and easy to manipulate.

185.    Chmil was the lead detective on a homicide case that resulted in the 1987 conviction of Valance Cole.  Cole's conviction was based largely on the testimony of Jeffrey Campbell, an individual addicted to crack cocaine who had been arrested earlier for a separate robbery.  Years

later, while dying from AIDS, Campbell recanted and said that Chmil promised that his robbery charges would be dropped if Campbell testified against Cole.  Chmil, Campbell said in a sworn statement, went so far as to give Campbell a script.

186.    In 2003, a judge denied Cole's motion to vacate his conviction but found that Cole was "probably innocent."  In addition, another suspect has come forward and confessed to the crime in detail no fewer than four times since 2007.

187.    Chmil has conceded the similarity between Campbell and Gomez (the witness Scarcella used repeatedly in his cases), stating that "Campbell was a lot like her" and that "[s]ometimes he'd tell you the truth, sometimes he wouldn't."

188.    An investigation by the KCDA showed that Defendants Scarcella and Chmil also made a habit of withholding reports for weeks if they did not want prosecutors or defense lawyers to know about a particular suspect.

189.    These are indicia of unprincipled detectives.  Indeed, allegations over the last several years indicate that Defendants Scarcella and Chmil engaged in a pattern of corrupt, unconstitutional, and dishonest police practices before and during the time that they were detectives on the instant case.

190.    The 1995 investigation by Defendants Scarcella and Chmil that resulted in Mr. Irons's conviction falls within a judicially recognized window of the detectives' misconduct.  As Judge ShawnDya L. Simpson noted in her opinion vacating Rosean Hargrove's 1992 conviction, Scarcella "was at the time of the investigation engaged in false and misleading practices.  The cases of David Ranta, Derrick Hamilton, Robert Hill, Alvena Jennette, and Darryl Austin that were investigated by Scarcella and prosecuted contemporaneously with this case in the early nineties

demonstrate this pattern and practice." *People v. Hargrove*, 2015 N.Y. Misc. LEXIS 3691, at *24-25 (Sup. Ct. Kings Cty. Apr. 14, 2015).

191.    As noted above, nearly 20 homicide convictions associated with Defendant Scarcella have been vacated to date; Defendant Chmil, as Scarcella's longtime partner, was involved in a number of those convictions.  At least nine of those convictions—those of Mr. Irons and his co-defendants, Messrs. Ellerbe and Malik; Eliseo DeLeon; David Ranta; Shabaka Shakur; Vanessa Gathers; Jabbar Washington; and Sundhe Moses—have been vacated where Defendant Scarcella, many times with the assistance of Defendant Chmil, coerced false confessions or fabricated written confessions from innocent individuals.

192.    As also noted above, numerous false confessions taken by Defendant Scarcella—those of David Ranta, Shabaka Shakur, Jabbar Washington, and Hector Lopez—contain the same or similar language as that allegedly used by Mr. Irons when he falsely confessed.

193.    During Defendant Scarcella's heyday and today, judges have decried his various forms of misconduct.

     a.   In the 1987 trial of James Jenkins, Justice Francis X. Egitto condemned
          Scarcella for his manipulative conduct of an identification procedure.  This
          included allowing the witnesses to mingle together and telling the
          witnesses, "We have the guy that committed the murder."

     b.   In vacating the conviction of Rosean Hargrove, Judge ShawnDya L.
          Simpson stated "[t]he pattern and practice of Scarcella's conduct . . .
          manifest[s] a disregard for rules, law and the truth." *People v. Hargrove*,
          2015 N.Y. Misc. LEXIS 3691, at *25 (Sup. Ct. Kings Cty. Arp. 14, 2015),
          *aff'd*, 162 A.D.3d 25 (2d Dep't 2018).

     c.   In vacating Shabaka Shakur's conviction in May of 2015, Judge Desmond
          Green determined that Scarcella has a "propensity to embellish or fabricate
          statements."

194.    The vast number of cases alleging Defendants Scarcella's and Chmil's misconduct is itself evidence that the NYPD knew of and ignored their unconstitutional practices.  As of 2018,

the KCDA pledged to review over 70 of Scarcella's cases for possible misconduct.  Chmil, as Scarcella's longtime partner, was also involved in many of those cases.  Of the nearly 20 Scarcella-related convictions that have been vacated, the KCDA has agreed to the vacatur at least 13 times.

195.    A media favorite during his career and a legend within the NYPD, Defendant Scarcella's conduct could not have escaped notice.  The *Daily News*' Pulitzer Prize-winning columnist Mike McAlary wrote in 1996 that "[i]n big cases, they bring in Scarcella."  Scarcella rose to the highest rank of First Grade Detective, and, upon information and belief, won numerous "Outstanding Police Investigation" awards from the Chief of Detectives.

196.    Given their notoriety and the number of known instances of misconduct that occurred in the presence of other police officers and supervisors—some of whom participated in the misconduct with Defendants Scarcella and Chmil—it is a near certainty that the NYPD knew of their deliberate or reckless conduct and either encouraged it or failed to train, supervise, or discipline for said conduct.

197.    City officials outside the NYPD also were aware of Defendants Scarcella's and Chmil's misconduct but remained willfully blind to it.  Indeed, a top prosecutor in 2013 disclosed that even those who respected Scarcella became skeptical of him after, as discussed above, he was caught on video in 1992 removing an informant from jail for an unauthorized outing.  KCDA officials have acknowledged, however, that they mostly kept quiet about their concerns, given Scarcella's popularity with their supervisors.

198.    This enabling culture permitted and caused the wrongful prosecution and conviction in Mr. Irons's case.

199.    Defendant Scarcella himself testified during the CPL Section 440.10 motion hearing of Shabaka Shakur (who succeeded on his claim that Scarcella fabricated Mr. Shakur's

confession) that there was essentially no oversight and supervision of Brooklyn homicide detectives in the 1980s: they could take cases as they wished and investigate them in whatever manner they desired.  Scarcella thus admitted that the NYPD maintained a laissez-faire policy, pattern, practice, and custom when it came to its homicide detectives.  Their constitutional violations would go unmonitored, unchecked, and undisciplined.

### 3.   Other Case Studies in Improper Police Conduct

200.   Importantly, Defendant Scarcella is not an isolated case of a detective gone rogue. Additional proof of a culture of unconstitutional conduct in the NYPD at that time exists in the voluminous record of other Brooklyn cases—not involving Scarcella—that demonstrates that other Brooklyn homicide detectives felt free to act similarly.  This pattern of behavior beyond Scarcella supports a clear inference that unscrupulous tactics were considered normal, acceptable, and encouraged within the Brooklyn homicide squad, as demonstrated in the following cases:

a.   **David McCallum and Willie Stuckey:** In October 1985, Brooklyn Detective Joseph Butta allegedly coerced false confessions from David McCallum and Willie Stuckey through the use of physical intimidation, including slapping Mr. McCallum in the mouth and drawing blood; threats of physical intimidation, including picking up a chair and threatening to hit Mr. McCallum across the head with it; and promises of leniency, including telling Mr. Stuckey that he could go home if he only cooperated ("Q. And what did he tell you would happen to you if you said those things? A. He told me he was going to call my house and he's going to let me go."; "Q. And right after you made the tape, did you think you were going home? A. Yes.").  Both men recanted immediately and, tellingly, both confessions contained inconsistencies, false fed facts, and fabrications.  Messrs. McCallum's and Stuckey's motions to vacate their convictions were granted on October 15, 2014, absent objection from the KCDA.

b.   **Antonio Yarbough and Sharrif Wilson:** On June 18, 1992, 18-year-old Antonio Yarbough came home to find that his mother, 12-year-old sister, and 12-year-old family friend had been savagely tied up, stabbed, garroted with electrical cords, and murdered.  Mr. Yarbough, who reported the crime to the police, and his 15-year-old friend Sharrif Wilson, confessed to the murders later that day.  Each was convicted (in Mr. Yarbough's case after a second trial, the first ending in a mistrial) and served nearly 22 years in prison before DNA evidence ruled both men out as the perpetrators.  In

2014, a Kings County Supreme Court Justice granted their motion to vacate, absent objection from the KCDA. According to a federal civil rights complaint filed by Mr. Yarbough, the NYPD allegedly used a combination of physical and psychological coercive techniques to secure the confessions, the latter including sleep deprivation, false evidence ploys, and false promises of leniency, including allegedly telling Mr. Wilson that they would let him go home if he would only tell them what they wanted to hear.

c. **Colin Warner:** Colin Warner was convicted in 1982 of the 1980 fatal shooting of Mario Hamilton. The victim's brother, Martell Hamilton, asserted that a member of the NYPD pressured him into picking out a photograph of Mr. Warner as someone he may have seen near the scene of the crime. Mr. Warner's motion to vacate his conviction was granted in 2001, absent objection from the KCDA.

d. **Barry Gibbs:** Barry Gibbs was convicted in 1988 of the murder of Virginia Robertson. Mr. Gibbs was exonerated in 2005 after the sole eyewitness, David Mitchell, recanted his line-up and trial identifications of Mr. Gibbs. Mitchell asserted that NYPD Detective Louis Eppolito had threatened his family if he did not identify Mr. Gibbs.

e. **Derrick Deacon:** Derrick Deacon was convicted in 1989 of the murder that same year of Anthony Wynn. Colleen Campbell was an eyewitness who saw the shooter in the hallway of the apartment building where the shooting took place, and who gave a physical description of him to the NYPD. When the NYPD identified Mr. Deacon as a suspect, Campbell told police the shooter was not Mr. Deacon, a man she knew from the neighborhood. Although she was called as a defense witness at trial to testify to that effect, she wavered on the stand and said she could not be sure. Years later, she testified in exoneration proceedings that the NYPD pressured her prior to her testimony, threatening her with the loss of her children if she did not cooperate with them. Although Mr. Deacon lost his motion to vacate at the Supreme Court level, the Appellate Division reversed, the case was re-tried in 2013, and he was acquitted.

f. **Jonathan Fleming:** Jonathan Fleming was convicted in 1990 of the 1989 fatal shooting of Darryl Rush. Jacqueline Belardo, a key prosecution witness, testified at Mr. Fleming's trial that she witnessed the shooting and recognized Mr. Fleming as the shooter. That testimony was false. Belardo later recanted her testimony and asserted that she agreed to identify Mr. Fleming at trial only after police officers threatened her with jail time on an unrelated felony larceny charge. Her recantation was corroborated by evidence of that larceny arrest and the charge's subsequent dismissal. Mr. Fleming's motion to vacate his conviction was granted in 2014 absent objection from the KCDA.

201.    Criminal and civil cases demonstrating the unconstitutional patterns, policies, customs, and usages of the NYPD include numerous cases in which the NYPD violated its *Brady* obligations, and the NYPD turned a blind eye to officer dishonesty, as demonstrated in the following cases:

- *People v. Cortez*, 149 Misc. 2d 886 (Crim. Ct. Kings Cty. 1990) (dismissing indictment after finding that police violated "spirit" of *Brady* by intentionally destroying tape they were court-ordered to preserve, and that KCDA shared responsibility in tape destruction);

- *People v. Moss*, 176 A.D.2d 826 (2d Dep't 1991) (reversing drug sale conviction and ordering new trial for *Rosario* violations, where officers lost or destroyed pieces of paper providing contemporaneous description of seller);

- *People v. Clausell*, 182 A.D.2d 132 (2d Dep't 1992) (ordering new trial for *Brady* violations, where prosecution withheld police report providing description of suspect that did not match defendant's and that "was wholly at odds with the testimony given by [the arresting officer]");

- *People v. Nikollaj*, 155 Misc. 2d 642 (Sup. Ct. Bronx Cty. 1992) (ordering new trial for *Rosario* violations, where police failed to turn over numerous inconsistent statements of complainant officers);

- *People v. Dunn*, 185 A.D.2d 54 (1st Dep't 1993) (reversing conviction in part where, among other things, detective destroyed his investigative notes);

- *People v. White*, 200 A.D.2d 351 (1st Dep't 1994) (reversing conviction where police report containing *Brady* and *Rosario* material was withheld and only discovered through defendant's post-conviction Freedom of Information Law requests to NYPD and Bronx County District Attorney's Office);

- *People v. Morrow*, 204 A.D.2d 356 (2d Dep't 1994) (reversing conviction where significant portion of police report was not disclosed);

- *People v. Brogdon*, 213 A.D.2d 418 (2d Dep't 1995) (reversing conviction where NYPD sergeant destroyed his notes, and where identification by undercover officer "cannot be said as a matter of law" to have been "merely confirmatory and not suggestive");

- *People v. Joseph*, 86 N.Y.2d 565 (1995) (reversing conviction and finding adverse inference instruction to be appropriate where police deliberately destroyed envelopes into which officers had placed cocaine vials seized from defendant);

- *People v. Anderson*, 222 A.D.2d 442 (2d Dep't 1995) (reversing conviction where officer's scratch notes were lost or destroyed due to officer's "lack of due care");

- *People v. White*, 232 A.D.2d 436 (2d Dep't 1996) (reversing conviction where officer lost his memo book through lack of due care);

- *People v. Jackson*, 237 A.D.2d 179 (1st Dep't 1997) (reversing conviction where police withheld Internal Affairs Division reports containing entries "that were significantly at variance with the prosecution's evidence at trial and were clearly evidence that was favorable to the accused");

- *People v. Gallman*, 240 A.D.2d 512 (2d Dep't 1997) (reversing conviction for failure to disclose notes of police interview with prosecution's key witness);

- *Gurley v. City of New York*, 95-CV-2422 (E.D.N.Y.): Settled in 1997 for $1,750,000, where conviction obtained in 1972 was vacated over 20 years later based on prosecutor's withholding of exculpatory evidence, including NYPD ballistics report; complaint alleged that NYPD had longstanding policy of deliberate indifference to constitutional requirements that exculpatory evidence be preserved and disclosed to defendants;

- *Napoli v. City of New York*, 97-CV-1255 (E.D.N.Y.): Settled in 1999 for $60,000, where plaintiff was arrested on weapons possession and assault charges based on false grand jury testimony by NYPD officers; complaint alleged *Monell* theory of liability based on City's deliberate indifference to constitutional obligations of NYPD, failure to train and supervise police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights;

- *Jefferson v. City of New York*, 98-CV-1097 (E.D.N.Y.): Settled in 1999 for $175,000, where plaintiff corrections officer was arrested on drug charges without probable cause, and charges remained pending for five months before grand jury returned no true bill; complaint alleged that NYPD officers failed to inform prosecutors of their knowledge of plaintiff's innocence during prosecution;

- *Sweazie v. City of New York*, 99-CV-419 (E.D.N.Y.): Settled in 1999 for $20,000, where plaintiff was arrested on weapons possession charges, prosecution continued based on NYPD officers' false statements in felony complaint, and charges were dismissed when grand jury voted no true bill;

- *Crespo v. City of New York*, 93-CV-8847 (S.D.N.Y.): Settled in 1996 for $25,000, where plaintiff was arrested without probable cause on weapons possession charges; complaint alleged *Monell* claim based on NYPD's "foster[ing of] a policy to which perjury and the falsification of documents were methods of securing indictments and convictions of innocent individuals";

- *Gordon v. City of New York*, 97-CV-8035 (S.D.N.Y.): Settled in 1998 for $40,000, where plaintiff was arrested without probable cause based on false allegations in felony complaint made by NYPD officers, and charges were dismissed by prosecutor three months after arrest; and

37

- *Lovell v. City of New York*, 00-CV-2 (S.D.N.Y.): Settled in 2000 for $40,000, where plaintiff was arrested without probable cause for turnstile jumping based on false statements made by NYPD officer in criminal complaint; complaint alleged *Monell* theory of liability based on City's deliberate indifference to constitutional obligations of NYPD, failure to train police officers, and negligent hiring of officers, which caused violations of plaintiff's constitutional rights; also alleged NYPD's institutional failure to follow up on civilian complaints made to Internal Affairs Bureau and Civilian Complaint Review Board.

202.    In the early 1990s, the New York City Comptroller's Office, under then-Comptroller Elizabeth Holtzman, conducted a study of police misconduct settlements by the City to assess whether credible claims of police misconduct led to disciplinary action by the NYPD.  The study confirmed that the NYPD systematically failed to take corrective action in response to credible claims of police misconduct.

### 4. *Former District Attorney Charles Hynes's Deliberate Indifference to the Prosecutorial and Investigative Misconduct Occurring in His Office*

203.    During the relevant period, misconduct by the NYPD went hand in hand with misconduct by the KCDA.

204.    Indeed, the post-conviction litigation of *Collins v. City of New York*, 11-CV-766 (E.D.N.Y.), revealed that at the time of Mr. Irons's arrest and conviction, the KCDA had no procedure in place to discipline prosecutors for violating their *Brady* obligations.  It further revealed that the KCDA was deliberately indifferent to or endorsed *Brady* violations generally. The *Collins* case concerned *Brady* violations in the KCDA in 1994 and 1995—right around the same time as Mr. Irons's arrest in 1995 and trial in 1996.  Post-conviction discovery revealed that District Attorney Charles Hynes—the same District Attorney in charge of the office when Mr. Irons was prosecuted—protected instead of disciplined ADAs when their misconduct was discovered.

205.    Hynes first became District Attorney on January 1, 1990.  In the *Collins* case, he and others admitted that the only disciplinary procedure in place for *Brady* violations was for

Hynes to personally review the appellate decision to decide if discipline was warranted.  Hynes and other KCDA executives could not identify a single instance of a prosecutor being disciplined during Hynes's entire 24-year tenure.

206.    At the time of Mr. Irons's prosecution, former DA Hynes, as the manager, chief administrator, and policymaker of the KCDA, a City agency, created and/or maintained policies, customs, and practices of deliberate indifference to violations by his employees of the constitutional rights of individuals who were investigated and criminally prosecuted in Brooklyn, including through (a) manufacturing false and misleading evidence and testimony; (b) knowingly presenting false testimony and arguments at criminal proceedings; (c) suppressing *Brady* information; (d) unlawfully arresting, imprisoning, and coercing witnesses; (e) abusing court process; and (f) covering up these unlawful practices.

207.    These policies, customs, and practices have led the Second Circuit and numerous courts within this District to recognize analogous § 1983 *Monell* claims brought by other wrongfully convicted persons.  *See, e.g.*, *Walker v. City of New York*, 974 F.2d 293, 300-01 (2d Cir. 1992) (reversing district court's dismissal of *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Bailey v. City of New York*, 79 F. Supp. 3d 424, 441-43 (E.D.N.Y 2015) (denying City's summary judgment motion on *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights); *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (denying City's motion to dismiss *Monell* claim based on deliberate indifference of KCDA, under former DA Hynes, to prosecutorial misconduct and violations of defendants' constitutional rights).

208.    These policies, customs, and practices persisted from former DA Hynes's induction as District Attorney in 1990 through (and, in certain respects, beyond) the end of his tenure as District Attorney in 2013.

209.    Former DA Hynes, as a matter of policy, custom, and practice, permitted, encouraged, and acquiesced in the commission of constitutional violations of the rights of suspects and defendants by prosecutors and investigators working with the KCDA.

210.    These policies, customs, and practices proximately caused the violations of Mr. Irons's constitutional rights described above and his wrongful conviction, imprisonment, and other damages.

211.    Former DA Hynes's policy and practice was to tolerate, fail to discipline, and encourage violations of his Office's constitutional obligations to make timely disclosure to the defense of *Brady* information.  Former DA Hynes's deliberate indifference to such violations created an "anything goes" atmosphere that caused such violations to continue, including in Mr. Irons's case.

212.    Under former DA Hynes's office-wide policies, customs, and practices, prosecutors and investigators were permitted and encouraged to refrain from making any record of *Brady* information concerning prospective prosecution witnesses to avoid disclosing information favorable to the defense, even though disclosure of such information was and is constitutionally required regardless of whether the information was recorded in written form.

213.    Former DA Hynes's training and discipline policies and practices were likewise consciously designed to permit and encourage *Brady* violations.

214.    Prosecutors and investigators were trained on avoiding the creation of *Brady* and *Rosario* material, instructed not to disclose *Brady* information if they could rationalize non-

disclosure by subjectively assessing the information as "unreliable" or "incredible," and encouraged to cover up *Brady* information kept hidden by other members of the KCDA.

215.    Prosecutors were permitted and encouraged not to comply with the KCDA's ongoing *Brady* obligations after trial; to resist defendants' efforts to obtain disclosure on appeal, during collateral attacks on convictions, and through Freedom of Information Law requests; and even to lie or mislead courts in affidavits and testimony, all with the aim of covering up wrongdoing within the KCDA and defeating defendants' efforts to expose misconduct and overturn wrongful convictions.

216.    Prosecutors, in violation of *Brady*, were permitted or encouraged to refrain from disclosing pressure tactics, promises, and rewards used to influence witnesses.

217.    Through a policy, custom, and practice of not disciplining prosecutors or investigators for *Brady* or other constitutional violations and taking no remedial action in cases where such wrongdoing was discovered (through court decisions, post-conviction proceedings, or otherwise), former DA Hynes encouraged such violations by demonstrating to his prosecutors and investigators that there would be no negative consequences for their failure to comply with *Brady* and other constitutional requirements.  To the contrary, prosecutors who violated defendants' due process rights were promoted, praised, given pay raises, and otherwise endorsed by former DA Hynes and his Office.

218.    Former DA Hynes had no employee handbook, manual, or other document setting forth any disciplinary process or potential penalties for *Brady* or other constitutional violations by prosecutors or investigators.  In fact, there was no such process or penalty.

219.    Despite dozens of court decisions finding that prosecutors had wrongfully withheld information, in violation of *Brady*, *Rosario*, or state discovery laws, or otherwise had engaged in

41

conduct that misled courts, juries, defendants, and defense attorneys, none of the prosecutors involved was disciplined.

220.    Stunningly, not once during his 24 years in office did former DA Hynes terminate a KCDA prosecutor for prosecutorial misconduct.

### 5.    *The Ample Notice to Former District Attorney Charles Hynes of the Prosecutorial and Investigative Misconduct Occurring in His Office*

221.    Examples of court decisions that put former DA Hynes on notice of the unlawful conduct being committed by his prosecutors and investigators, before such unlawful conduct led to Mr. Irons's false conviction, include:

- *Walker v. City of New York*, 974 F.2d 293 (2d Cir. 1992) (upholding *Monell* claim against City of New York for unlawful policies of KCDA that allegedly resulted in withholding of *Brady* material causing plaintiff's wrongful conviction and 19-year imprisonment);

- *People v. Vilardi*, 150 A.D.2d 819 (2d Dep't 1989) (vacating conviction based on prosecutor's failure to turn over exculpatory police report);

- *People v. Lugo*, 153 A.D.2d 761 (2d Dep't 1989) (granting motion to vacate conviction based on *Brady* and *Rosario* violations because *Rosario* violation clearly undermined conviction, rendering *Brady* analysis unnecessary);

- *People v. Rayford*, 158 A.D.2d 482 (2d Dep't 1990) (reversing conviction and ordering new trial because prosecutor suppressed exculpatory information, and reversing trial court order admitting evidence obtained using suggestive identification procedures);

- *People v. Nedrick*, 166 A.D.2d 725 (2d Dep't 1990) (recounting allegations that prosecutor failed to disclose tape-recorded impeachment material);

- *People v. Anderson*, 160 A.D.2d 806 (2d Dep't 1990) (observing that prosecutor failed to timely disclose impeachment material);

- *People v. Brazzeal*, 172 A.D.2d 757 (2d Dep't 1991) (reversing conviction because, *inter alia*, prosecutor's improper summation violated defendant's due process rights);

- *People v. Faison*, 176 A.D.2d 752 (2d Dep't 1991) (observing that prosecutor failed to timely disclose witness's prior statement);

- *People v. Crespo*, 188 A.D.2d 483 (2d Dep't 1992) (affirming mistrial grant due to prosecutor's *Brady* violation);

- *People v. Brown*, 187 A.D.2d 437 (2d Dep't 1992) (noting that trial court sanctioned prosecutor for delayed production of *Brady* material);

- *People v. Cecora*, 186 A.D.2d 215 (2d Dep't 1992) (vacating conviction and ordering new trial because prosecution and police failed to disclose interview notes containing potential impeachment information);

- *People v. Hughes*, 181 A.D.2d 912 (2d Dep't 1992) (ordering trial court to hold hearing regarding prosecution's failure to disclose exculpatory police report);

- *People v. Inswood*, 180 A.D.2d 649 (2d Dep't 1992) (acknowledging prosecution's failure to turn over *Brady* material);

- *People v. Lebron*, 184 A.D.2d 784 (2d Dep't 1992) (reversing conviction because prosecution presented false testimony from police officer that was "completely unbelievable and untrustworthy");

- *People v. Jackson*, 198 A.D.2d 301 (2d Dep't 1993) (affirming vacatur of conviction and new trial order because prosecutors failed to timely disclose exculpatory statements, and noting evidence that prosecutor destroyed notes of interview with witness who ultimately provided exculpatory testimony);

- *People v. Gurley*, 197 A.D.2d 534 (2d Dep't 1993) (affirming trial court's grant of post-conviction motion arising from KCDA's suppression of *Brady* information);

- *People v. Stevens*, 199 A.D.2d 441 (2d Dep't 1993) (noting that prosecution improperly withheld *Brady* and *Rosario* material);

- *People v. Cortez*, 149 Misc. 2d 886 (Sup. Ct. Kings Cty. 1990) (dismissing complaint because intentional destruction of tape containing impeachment material violated court order and constituted *Brady* violation; and

- *People v. Young*, 155 Misc. 2d 878 (Sup. Ct. Kings Cty. 1992) (ordering new trial because of failure to disclose impeachment material and finding that prosecution witnesses offered "tailored" testimony.

### 6. Examples of the Kings County District Attorney's Office's Unlawful Policies, Practices, and Customs

222.    Examples of former DA Hynes's ongoing policies and practices of encouraging, authorizing, and/or permitting misconduct by his prosecutors and investigators, include:

- *Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001) (reversing denial of habeas petition where prosecutor suppressed *Brady* material and misled defense counsel regarding crucial witness);

- *Boyette v. LeFevre*, 246 F.3d 76 (2d Cir. 2001) (reversing denial of habeas petition where prosecutors suppressed *Brady* material);

- *People v. Scott*, 667 N.E.2d 923 (N.Y. 1996) (observing that prosecution failed to disclose statement regarding polygraph result that had been specifically requested by defendant);

- *People v. Bond*, 735 N.E.2d 1279 (N.Y. 2000) (ordering new trial where prosecution failed to disclose prior unrecorded statements to police by prosecution's main witness that she did not see shooting about which she provided "eyewitness" testimony);

- *People v. Calabria*, 727 N.E.2d 1245 (N.Y. 2000) (ordering new trial where prosecutor repeatedly defied court's ruling and made false or misleading argument to jury);

- *People v. Jenkins*, 774 N.E.2d 716, 720-22 (N.Y. 2002) (Kaye, C.J., dissenting) (observing that prosecutor's delayed midtrial disclosure of ballistics report "blind sided" defense);

- *People v. Fuentes*, 907 N.E.2d 286 (N.Y. 2010) (observing that prosecutor improperly withheld portion of medical records containing potentially favorable evidence for defense);

- *People v. Khadaidi*, 201 A.D.2d 585 (2d Dep't 1994) (reversing conviction because prosecution failed to disclose interview notes with complainant containing prior inconsistent statement);

- *People v. Alvarado*, 201 A.D.2d 486 (2d Dep't 1994) (affirming order vacating conviction and ordering new trial because prosecution failed to disclose police reports containing impeachment material);

- *People v. Barnes*, 200 A.D.2d 751 (2d Dep't 1994) (observing that prosecutor neither recorded nor disclosed eyewitness's recantation);

- *People v. Bramble*, 207 A.D.2d 407 (2d Dep't 1994) (upholding sanctions for prosecution's failure to preserve police audiotapes notwithstanding defense discovery request);

- *People v. Roberts*, 203 A.D.2d 600 (2d Dep't 1994) (reversing conviction where prosecution delayed by one year in disclosing exculpatory witness statement, by which time witness could not be located prior to trial);

- *People v. Scott*, 216 A.D.2d 592 (2d Dep't 1995) (finding that prosecutor improperly suppressed reports, including polygraph results indicating key witness was withholding information);

- *People v. Rahman*, 231 A.D.2d 745 (2d Dep't 1996) (remitting for hearing concerning prosecution's apparent improper failure to produce eyewitness informant);

- *People v. Perkins*, 227 A.D.2d 572 (2d Dep't 1996) (noting that prosecutor failed to timely disclose, *inter alia*, cooperation agreement with witness);

44

- *People v. Callendar*, 227 A.D.2d 499 (2d Dep't 1996) (vacating conviction and ordering new trial due to prosecutor's failure to turn over notes of detective's prior statement);

- *People v. Bruce*, 224 A.D.2d 438 (2d Dep't 1996) (ordering new trial because of prosecutor's failure to produce police reports containing impeachment material);

- *People v. LaSalle*, 243 A.D.2d 490 (2d Dep't 1997) (ordering new trial because of prosecutor's "blatant misrepresentation of the facts" during summation);

- *People v. Gourgue*, 239 A.D.2d 357 (2d Dep't 1997) (reversing conviction and ordering new trial because prosecutor recorded complainant's statements in question form to "circumvent" disclosure obligation);

- *People v. Hill*, 244 A.D.2d 572 (2d Dep't 1997) (affirming order sanctioning prosecutor for *Rosario* violation);

- *People v. Gramby*, 251 A.D.2d 346 (2d Dep't 1998) (observing that prosecutor suppressed and failed to timely disclose 911 tape);

- *People v. Campbell*, 269 A.D.2d 460 (2d Dep't 2000) (reversing conviction and dismissing charge where prosecutor improperly suppressed tape-recorded statement by complainant);

- *People v. Maddery*, 282 A.D.2d 761 (2d Dep't 2001) (noting prosecutor's delayed disclosure of 911 tape);

- *People v. King*, 298 A.D.2d 530 (2d Dep't 2002) (noting prosecutor's delayed disclosure of 911 tape);

- *People v. Vielman*, 31 A.D.3d 674 (2d Dep't 2006) (reversing conviction and ordering new trial because prosecutor's summation "rested on a false premise" and was "a blatant attempt to mislead the jury");

- *People v. Jones*, 31 A.D.3d 666 (2d Dep't 2006) (ordering new trial where prosecution failed to correct false testimony of key witness and improperly vouched for witness's credibility);

- *People v. Thompson*, 54 A.D. 3d 975 (2d Dep't 2008) (observing that prosecutor suppressed *Brady* material indicating someone other than defendant committed crime);

- *People v. Ramos*, 166 Misc. 2d 515 (Sup. Ct. Kings Cty. 1995) (vacating conviction and ordering new trial because, due to KCDA policy of not taking notes of witness interviews, trial prosecutor was unaware of information acquired by previously assigned prosecutors for which court had ordered disclosure);

- *People v. Davis*, 184 Misc. 2d 680 (Sup. Ct. Kings Cty. 2000) (dismissing indictment because prosecution violated court's order to disclose exculpatory evidence to defense before indictment);

- *People v. Cannon*, 191 Misc. 2d 136 (Sup. Ct. Kings Cty. 2002) (upholding sanctions against prosecution for failure to preserve surveillance photographs); and

- *People v. Malik*, 25 Misc. 3d 1214(A) (Sup. Ct. Kings County 2009) (vacating conviction and ordering new trial where prosecution improperly suppressed police report).

223.   Under former DA Hynes's policies, customs, and practices, no prosecutor was fired, suspended, fined, or demoted for such misconduct.

224.   Even where misconduct was found to have occurred, no record of the misconduct was placed in the personnel file of any prosecutor or investigator responsible.  No prosecutor was ever reported to outside disciplinary bodies for such misconduct, even when the misconduct violated applicable ethical rules.

225.   To the contrary, in opposing defendants' efforts to overturn their convictions in such cases, former DA Hynes stubbornly defended the propriety of his employees' behavior, thereby ratifying and signaling his tolerance of it.  Personnel found to be involved in such misconduct continued to receive raises, bonuses, and promotions—sometimes within weeks or even days of court decisions identifying the misconduct.

226.   High-level KCDA officials have acknowledged in deposition testimony that there was no formal disciplinary procedure or policy for prosecutorial or investigator misconduct committed by KCDA employees, and they were unaware of any prosecutor or investigator ever being disciplined during former DA Hynes's tenure for unconstitutional conduct committed during a criminal investigation or prosecution.  In fact, no discipline had been imposed on any of the prosecutors or investigators involved in cases of proven misconduct.

227.   Former DA Hynes's office likewise had no formal policy requiring disclosure of *Brady* information or any written policy on how to disclose it.

228.   Former DA Hynes's office provided no training on how to question or evaluate informant or accomplice witnesses.

229.    One high-ranking official testified that, despite having virtually daily contact with former DA Hynes over many years, he never heard former DA Hynes discuss the training of prosecutors in such areas.

230.    Even after judgments were entered against KCDA-affiliated individual capacity defendants in various civil rights lawsuits alleging prosecutorial and investigative misconduct, former DA Hynes's office conducted no investigation and imposed no discipline on any of the employees involved.

## DAMAGES

231.    This action seeks damages for the period from December 13, 1995 (the date of Mr. Irons's arrest) through the present.  Defendants' unlawful, intentional, willful, purposeful, deliberately indifferent, reckless, bad-faith and/or malicious acts, misdeeds, and omissions caused Mr. Irons to be maliciously prosecuted, unfairly tried, wrongfully convicted, and to endure more than 27 years of wrongful imprisonment, including the physical and mental damage arising therefrom.

232.    Mr. Irons was 18 years old at the time of his incarceration and was released in 2022 at age 45.

233.    He spent his entire young adulthood imprisoned for a crime he did not commit, serving his sentence in various maximum-security prisons throughout New York State.

234.    During his wrongful imprisonment, Mr. Irons suffered extreme hardships, including, without limitation, physical assault, psychological abuse, extreme degradation, pain and suffering, and the loss of more than 27 years of his life.  Mr. Irons was labeled as a snitch for implicating his co-defendants in his false and coerced confession and was therefore subjected to yet more exposure and abuse.

235.    Mr. Irons also lost tremendous opportunities.  He lost the most vital years of his life and precious time with his family and friends, including with his mother, who died during his incarceration.

236.    As a direct and proximate result of the acts of Defendants, the injuries and damages sustained by Mr. Irons, arising from the deprivation of his civil rights, include: the violations of his clearly established rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution; personal injuries; past and future pain and suffering; past and future severe mental anguish; past and future emotional distress; extreme fear; economic damages including loss of income and diminution in future earning potential and the inability to obtain certain professional licenses; infliction of physical illness and injury resulting from his confinement; humiliation, indignities, embarrassment, degradation, egregious injury to reputation; permanent loss of natural psychological development;  and restrictions on all forms of personal freedom and physical liberty including but not limited to diet, sleep, personal care, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression.

237.    All the alleged acts, misdeeds and omissions committed by Individual Defendants described herein for which liability is claimed were done intentionally, willfully, purposefully, knowingly, unlawfully, maliciously, wantonly, recklessly, and/or with bad faith, and said proscribed conduct of Individual Defendants meets all the standards for imposition of punitive damages.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### 42 U.S.C. § 1983

*Denial of Due Process and Right to a Fair Trial,*
*Fabrication of Evidence, and Suppression of* Brady *Information*
*(U.S. Constitution Amendments V and XIV)*

**Against All Individual Defendants**

238.  Mr. Irons repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

239.  Individual Defendants, acting knowingly, intentionally, deliberately, with malice, and under color of law, deprived Mr. Irons of his clearly established rights under the Fifth and Fourteenth Amendments to the U.S. Constitution to due process and a fair trial.  They did so by: (1) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony by coercing Mr. Irons into giving a false confession; and (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information.

240.  No person of reasonable caution and acting in good faith, having the knowledge and information Individual Defendants had, would have been warranted in concluding that Mr. Irons was involved in the murder of Kaufman, such as to support a probable cause determination. Even setting aside their knowledge that they had manufactured evidence and testimony, coerced Mr. Irons into giving a false confession, and suppressed *Brady* information, Individual Defendants knew or, in the absence of deliberate indifference, recklessness, and gross negligence, should have known that there were numerous reasons for skepticism about the truth of the "confession."  These include but are not limited to: (1) Mr. Irons's well-supported alibi; (2) Mr. Irons's significant cognitive deficiencies, which were readily apparent at the time he gave his false confession; (3) the

49

numerous inconsistencies in Mr. Irons's false confession; (4) the fact that Mr. Irons did not match the descriptions of the perpetrators while two other initial suspects, Sport and Crime, did; (5) the eyewitness testimony of one of the 911 callers who reported the incident and who testified unequivocally at trial that she did not recognize Mr. Irons; and (6) the complete absence of physical and forensic evidence tying Mr. Irons to the murder.

241.    The presumption of probable cause created by the grand jury indictment is overcome by the fact that Mr. Irons's indictment was secured based on bad-faith police misconduct.  Specifically, the false confession extracted by Defendants Scarcella and Chmil was, upon information and belief, the central piece of evidence presented to the grand jury and proximately caused the resulting indictment.

242.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that the false and misleading evidence would deprive Mr. Irons of a fair trial and result in his wrongful conviction and incarceration.

243.    Individual Defendants knew, intended, or were deliberately indifferent to the fact that *Brady* information would be concealed from Mr. Irons and his attorney.

244.    Individual Defendants' conduct, committed in concert with one another or others, deprived Mr. Irons of his rights under the Constitution: (1) not to be prosecuted, convicted, or imprisoned based on false, fabricated, manufactured, or misleading evidence in violation of his rights under the Due Process and Fair Trial Clauses of the Fifth and Fourteenth Amendments to the U.S. Constitution; and (2) to timely disclosure of material evidence favorable to the defense under *Brady* in violation of his rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

245.     Individual Defendants' acts and omissions proximately caused the continuation of Mr. Irons's criminal prosecution, his conviction, his loss of liberty and detention, and his resulting damages.

246.     Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Irons's constitutional rights.

247.     Defendants Scarcella and Chmil's falsification of evidence, coercion of Mr. Irons, and arrest of Mr. Irons without probable cause establishes that they acted with actual malice.

248.     Defendant Paul's participation in, knowledge of, and/or indifference to such falsification of evidence, coercion of Mr. Irons, and arrest of Mr. Irons without probable cause establishes that he acted with actual malice.

249.     Defendants John and Jane Does 1-25 are employees of the NYPD or KCDA who knew of and aided and abetted, and/or failed to intervene to prevent, Defendants Scarcella, Chmil, and Paul's falsification of evidence, coercion of Mr. Irons, arrest of Mr. Irons without probable cause, and denial of Mr. Irons's right to a fair trial.

250.     The prosecution terminated in Mr. Irons's favor when his conviction was eventually vacated and the indictment against him dismissed.

251.     Mr. Irons was, in fact, innocent of the crime for which he was convicted and incarcerated.

252.     Individual Defendants' actions were willful, malicious, oppressive, and reckless, and were of such a nature that punitive damages should be imposed.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983

*Malicious Prosecution and Denial of Fourth Amendment Rights*
*(U.S. Constitution Amendments IV and XIV)*

**Against All Individual Defendants**

253.    Mr. Irons repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

254.    Individual Defendants, acting individually and in concert, with malice, under color of law, and knowing that probable cause did not exist to arrest Mr. Irons and prosecute him for the murder of Kaufman, caused Mr. Irons to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Irons's clearly established right under the Fourth and Fourteenth Amendments to the U.S. Constitution to be free from unreasonable searches and seizures.

255.    Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known that probable cause did not exist to arrest and prosecute Mr. Irons, including but not limited to the fact that Mr. Irons's false confession was the product of improper coercion by Defendants Scarcella and Chmil, and this factor as well as additional material exculpatory and impeachment evidence that Individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Irons.

256.    In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Mr. Irons, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by coercing Mr. Irons

into giving a false confession; and (2) suppressed *Brady* information, including about alternative suspects.

257.    Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Irons's constitutional rights.

258.    Individual Defendants initiated and continued the prosecution against Mr. Irons without probable cause, in violation of Mr. Irons's clearly established constitutional rights.  No reasonable officer at the time of Mr. Irons's prosecution or thereafter would have believed this conduct was lawful.

259.    The prosecution terminated in Mr. Irons's favor when his conviction was eventually vacated and the indictment against him dismissed.

260.    Mr. Irons was, in fact, innocent of the crime for which he was convicted and incarcerated.

261.    As a direct and proximate result of Individual Defendants' conduct, Mr. Irons was maliciously prosecuted, wrongly convicted, imprisoned for nearly 27 years, and suffered the other grievous damages and injuries set forth above.

### THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983

*Monell v. Department of Social Services*, 436 U.S. 658 (1978)

### Against Defendant the City of New York

262.    Mr. Irons repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

263.    At the time of Mr. Irons's arrest and prosecution, the NYPD and KCDA, both agencies of Defendant the City of New York, created and maintained policies, customs, and

practices of deliberate indifference to violations by its employees of the constitutional rights of individuals who were investigated and criminally prosecuted, including through: (1) manufacturing, causing the manufacturing of, or failing to intervene in the manufacturing of false or misleading evidence and testimony; (2) suppressing, causing the suppression of, or failing to intervene in the suppression of *Brady* information; and (3) covering up these unlawful practices.

264. Just a year and a half before Mr. Irons's trial, the Mollen Commission investigated corruption in the NYPD and exposed the NYPD's practice of failing to properly train, supervise, and discipline officers for fabricating evidence, engaging in improper police investigations, and failing to turn over *Brady* material.

265. This Court has previously found that the Mollen Report provides sufficient evidence to establish that there was an unlawful custom or practice within the NYPD during the period in question. *See e.g.*, *Pipitone*, 57 F. Supp. at 191. Indeed, the investigation of Kaufman's murder, and the resulting conviction of Mr. Irons, falls within a judicially recognized window wherein Defendant Scarcella "engaged in false and misleading practices." *Hargrove*, 2015 N.Y. Misc. LEXIS 3691, at *24.

266. As the Mollen Report found, Defendants Scarcella, Chmil, and Paul's misconduct could not have been isolated or unknown within the NYPD. Rather, a laissez-faire NYPD culture, paired with a statistic-obsessed KCDA, allowed Defendants Scarcella, Chmil, and Paul to continuously violate the constitutional rights of the citizens of New York City, including Mr. Irons. In Mr. Irons's case, Defendants Scarcella, Chmil, and Paul manufactured a confession to secure Mr. Irons's unlawful arrest, conviction, and imprisonment.

267. The size and magnitude of Defendants Scarcella, Chmil, and Paul's misconduct could not have gone unnoticed. Yet Defendants Scarcella, Chmil, and Paul suffered no consequences.

268. The prosecutors' conduct in this case also exemplifies the KCDA's culture during this period that valued winning over the truth or defendants' constitutional rights. Former DA Hynes has admitted in litigation that he and high-level KCDA management failed to discipline prosecutors who were found by appeals courts to have acted improperly by withholding *Brady* material and engaging in other misconduct. This created a *de facto* policy of immunity from disciplinary action that fostered prosecutorial misconduct so long as it secured convictions. Such prosecutorial misconduct included, *inter alia*, suppressing *Brady* information, as in the instant case.

269. The ADAs prosecuting Mr. Irons knew that DA Hynes would not only fail to discipline them, but that he would support them and oppose any attempts to uncover the wrongdoing of wrongful convictions.

270. The violations of Mr. Irons's constitutional rights and his resulting injuries were proximately and foreseeably caused by conduct, chargeable to the NYPD, the KCDA, former DA Hynes, and by extension, the City of New York, amounting to deliberate indifference to the constitutional rights of persons, including Mr. Irons, subject to arrest and investigation, including:

  a. the institution and implementation of inadequate and unlawful policies, procedures, and customs concerning:

    i. the duty not to create or use false or misleading evidence, testimony, and arguments during criminal proceedings, including bail hearings, pretrial hearings, trials, and post-conviction proceedings;

    ii. the continuing obligation to correct false, inaccurate, incomplete, or misleading evidence, testimony, statements, and argument, whenever such misconduct is discovered to have occurred, including moving or consenting

to overturn convictions discovered to have been obtained through such unconstitutional means; and

    iii.  the continuing duty to obtain, preserve, and timely disclose, during criminal investigations and prosecutions, all material evidence or information favorable to a person suspected, accused, or convicted of criminal conduct, including exculpatory evidence as well as evidence impeaching or undermining prosecution witnesses; and

  b.  the failure to adequately instruct, train, supervise, and discipline employees with respect to such matters.

271. The foregoing express or *de facto* policies, practices, and customs (including the failure to properly instruct, train, supervise, or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the City, who knew that such policies, procedures, regulations, practices, and customs implicated issues that regularly arise in the investigation and prosecution of criminal cases.

272. The City knew of the unconstitutional conduct occurring among its employees in light of the numerous credible allegations, many substantiated by judicial decisions, that its employees: (1) wrongfully withheld, lost, or destroyed evidence favorable to the defense that was required to be timely disclosed to the defense under *Brady*; (2) had presented or failed to correct false or misleading testimony and argument; and (3) had abused judicial process to coerce false or inherently unreliable testimonies and statements.

273. Despite this knowledge, the supervisory and policymaking officers and officials of the City perpetuated or failed to take preventative or remedial measures to terminate said policies, procedures, practices, and customs; did not effectively instruct, train, or supervise their personnel with regard to the proper constitutional and statutory requirements in the exercise of their authority; had no employee handbook or other published practices, policies, or procedures for investigating and disciplining employees who had engaged in *Brady* violations and related constitutional violations, and did not discipline or otherwise properly supervise the individual

personnel who engaged in such practices, but instead tolerated the policies, procedures, regulations, practices, and customs, described above, with deliberate indifference to the effect their actions would have upon the constitutional rights of individuals and citizens of the City and State of New York.

274.    The aforesaid policies, practices, and customs of the City were substantial, contributing factors in bringing about the aforesaid violations of Mr. Irons's rights under the Constitution and laws of the United States and in causing his wrongful conviction and resulting damages.

275.    The supervisory and policymaking officers and officials of the City were deliberately indifferent to the manner in which convictions were secured without regard to defendants' constitutional rights or guilt.  The violations of defendants' rights were endemic, and the City was aware of these practices but did not take corrective or preventative action to correct it.

## FOURTH CAUSE OF ACTION

### Malicious Prosecution

*New York State Law*

### Against All Defendants

276.    Mr. Irons repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

277.    Individual Defendants, acting individually and in concert, with malice, and knowing that probable cause did not exist to arrest Mr. Irons and prosecute him for the murder of Kaufman, caused Mr. Irons to be arrested, charged, and prosecuted for that crime.

278.    Specifically, Individual Defendants, with malice, knew or in the absence of their deliberate and reckless indifference to the truth should have known that probable cause did not

exist to arrest and prosecute Mr. Irons, including but not limited to the fact that Mr. Irons's false confession was the product of improper coercion by Defendants Scarcella and Chmil, and this factor as well as additional material exculpatory and impeachment evidence that Individual Defendants did not disclose undermined the evidence presented in support of a probable cause finding against Mr. Irons.

279.    In addition, Individual Defendants, acting individually and in concert, knowingly, intentionally, deliberately, and with malice, misrepresented the truth and withheld exculpatory facts from the grand jury that vitiated probable cause against Mr. Irons, including but not limited to their having: (1) manufactured false or misleading evidence and testimony by coercing Mr. Irons into giving a false confession; and (2) suppressed *Brady* information, including about alternative suspects.

280.    Individual Defendants committed the foregoing violations knowingly, intentionally, willfully, recklessly, and with deliberate indifference to the truth and Mr. Irons's constitutional rights.

281.    Individual Defendants initiated and continued the prosecution against Mr. Irons without probable cause.

282.    The prosecution terminated in Mr. Irons's favor when his conviction was eventually vacated and the indictment against him dismissed.

283.    Mr. Irons was, in fact, innocent of the crime for which he was convicted and incarcerated.

284.    Defendant the City of New York is liable under the doctrine of *respondeat superior* for the malicious prosecution of Mr. Irons by Individual Defendants, all of whom were acting as agents of the City of New York and within the scope of their employment.

285.     As a direct and proximate result of Defendants' conduct, Mr. Irons was maliciously prosecuted, wrongly convicted, imprisoned for nearly 27 years, and suffered the other grievous damages and injuries set forth above.

## FIFTH CAUSE OF ACTION

### New York State Constitution

*Denial of Due Process and Right to a Fair Trial, Fabrication of Evidence, Suppression of Exculpatory Information, and Malicious Prosecution (New York State Constitution, Article I, §§ 5, 6, and 12)*

### Against All Defendants

286.     Mr. Irons repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

287.     The acts and omissions described above caused violations of Mr. Irons's rights under the New York State Constitution, including the rights to due process and to be free from unreasonable searches and seizures, and Mr. Irons's resulting damages.

288.     To the extent that any of Mr. Irons's claims against one or more Defendants is unavailable under 42 U.S.C. § 1983—including, but not limited to, 42 U.S.C. § 1983's lack of *respondeat superior* liability—Mr. Irons retains a legal remedy for such claims under the New York State Constitution.

## SIXTH CAUSE OF ACTION

### Negligence

*New York State Law*

### Against Defendant the City of New York

289.     Mr. Irons repeats and realleges each and every allegation contained in the preceding paragraphs above as if fully set forth herein.

290.     Defendant the City of New York is liable for negligence, having breached its duty of reasonable care to Mr. Irons.

291.     Specifically, and by way of example, the City intentionally, recklessly, negligently, and/or with deliberate indifference failed to adequately train, supervise, and discipline its agents and employees with regard to the matters described above.  The City of New York's inadequate training, supervision, and discipline proximately caused the misconduct described above and Mr. Irons's wrongful conviction and resulting damages.

292.     The City's negligence and gross negligence directly and proximately caused Mr. Irons to be wrongly prosecuted and imprisoned for nearly 27 years.

293.     Mr. Irons was, in fact, innocent of the crime for which he was convicted and incarcerated.   Mr. Irons's cause of action for negligence was unavailable to him until his prosecution finally terminated in his favor, when his conviction was eventually vacated and the indictment against him dismissed.  As a direct and proximate result of Defendants' conduct, Mr. Irons was maliciously prosecuted, wrongly convicted, imprisoned for nearly 27 years, and suffered the other grievous damages and injuries set forth above.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff James Irons demands judgment against the above-captioned Defendants as follows:

a.   for compensatory damages to be determined at trial, but in all events no less than $50 million;

b.   for punitive damages against each Individual Defendant in an amount to be determined at trial;

c.   for reasonable attorneys' fees, costs, and disbursements, under 42 U.S.C. § 1988 and other applicable laws;

d.   for pre- and post-judgment interest as allowed by law; and

    e.  for such other relief as this Court deems just and proper.

Dated: October 12, 2023
       New York, New York

                  SHANIES LAW OFFICE LLC


By:  _David B. Shanies_

                  David B. Shanies
                  Deborah I. Francois
                  110 West 40th Street, Tenth Floor
                  New York, New York 10018
                  (212) 951-1710 (Tel)
                  (212) 951-1350 (Fax)
                  david@shanieslaw.com
                  deborah@shanieslaw.com

                  *Attorneys for Plaintiff James Irons*